### I. T. S. RUBBER CO. v. ESSEX RUBBER CO.

District Court, D. Massachusetts.   December 18, 1922.

No. 1008.

1. Patents ⚖➔327(4)—Interlocutory decree pro confesso does not estop defendant from again contesting issue of infringement.

Where, in patent infringement suit involving same claims and same alleged infringing articles as present suit, an interlocutory decree pro confesso was entered, but record failed to show that final decree was entered, neither defendant therein nor present defendant, alleged to have conducted the defense, is estopped to contest issue of infringement in present case.

2. Patents ⚖➔327(14)—Evidence showed that defendant did not control defense of another infringement suit, so as to be estopped by decree therein.

Evidence in patent infringement suit held, to show that defendant did not direct or control defendant in another suit by same plaintiff involving same claims and alleged infringing articles, so as to be estopped by decree therein from contesting issue of alleged infringement as to same articles.

3. Patents ⚖➔327(14)—Defendant in patent infringement suit did not, by co-operating with defendants in other suits, exercise such control as to be estopped by decrees therein from contesting present suit (equity rule 16).

Where, in patent infringement suits involving the same claims and alleged infringing articles as present suit, defendant in present suit did nothing to direct or control defense of such other suits until after interlocutory decrees pro confesso and issuing of notices to respective defendants to appear and account, whereupon it co-operated with such defendants to bring about adjustment of damages and profits, held, that, in view of equity rule 16, defendant did not exercise such control of cases as to be estopped by decrees therein from contesting issue of infringement in present case.

4. Patents ⚖➔321—After entry of interlocutory decree pro confesso in patent infringement suit, no one may appear as a party in defense (equity rule 16).

Under equity rule 16, when order and interlocutory decree pro confesso are entered in a patent infringement suit, the case thereafter proceeds ex parte, and neither defendant nor any one else has any right to appear as a party in defense of such suit.

5. Patents ⚖➔327(6)—Decrees pro confesso do not become binding as estoppel until entry of final decree and expiration of term at which they were entered.

Decrees pro confesso, entered in plaintiff's favor in patent infringement suits, do not become binding as an estoppel until entry of final decree and expiration of the term at which they were entered.

6. Patents ⚖➔327(6)—Unrevoked decrees pro confesso bind defendants as to question of infringement from date of their entry.

After entry of decrees pro confesso in plaintiff's favor in patent infringement suits, and as long as they stand unrevoked, defendants are absolutely barred and precluded from alleging anything in opposition to or in derogation of them, and, where decrees are never revoked, defendants are bound by them as to question of infringement from date of their entry.

7. Patents ⚖➔168(2)—Patentee, accepting claims with qualifying clause, cannot construe accepted claims to cover what would be embraced within denied claims.

Where patentee sought broad claims in Patent Office, which were denied, and acquiesced in denial of such claims, and accepted claims embodying a qualifying clause, the claims, which were allowed with the qualifying clause, cannot be construed broadly, and to cover what would be embraced within claims which were denied.

8. Patents ⚖➔148—Patentee, narrowing claims by inserting restricting clause, cannot give claims larger scope, which they might have had without such clause.

Patentee, who narrowed his claims by insertion of restricting clause in order to obtain any claims under reissued patent, cannot by construction, or by resorting to doctrine of equivalents, give claims larger scope, which they might have had without restricting clause.

9. Patents ⚖➔328—Reissue No. 14,049, claims 5–9, for improvement in resilient heels, held not infringed.

Tufford reissue patent No. 14,049, claims 5–9, for an improvement in the resilient heels, particularly in cushion heels of type comprising an elastic lift, adapted to be applied to ordinary shoe heel, as restricted by the qualifying clause which they contain, held not infringed by defendant's heels.

In Equity. Suit for infringement of patent by the I. T. S. Rubber Company against the Essex Rubber Company. Decree ordered dismissing plaintiff's bill.

Frederick A. Tennant and Nathan Heard, both of Boston, Mass., F. O. Richey, of Cleveland, Ohio, and E. D. Fales, of Schenectady, N. Y., for plaintiff.

Emery, Booth, Janney & Varney, of Boston, Mass. (Lucius Varney, of Boston, Mass., of counsel), for defendant.

BINGHAM, Circuit Judge. This action is now before the court for hearing on bill, answer, and proofs, and is the same case that was before the District Court in 270 F. 593, and on appeal before the Circuit Court of Appeals in 276 F. 478, and 281 F. 5. It is a suit in equity, charging infringement of reissued letters patent No. 14,049, applied for June 22, 1915, and issued January 11, 1916, to the I. T. S. Rubber Company, assignee, through mesne assignments from John G. Tufford.

The invention is for an improvement in resilient heels, and particularly in cushion heels of the type comprising an elastic lift, adapted to be applied to the ordinary shoe heel. Claims 5, 6, 7, 8, and 9 are in issue, and the contention is that certain heels (similar to Exhibit 1, Series A, and Exhibit 2, Series B), which it is agreed were sold by the defendant in the district of Massachusetts between January 11, 1916, the date of the letters patent, and the date when the complaint in the cause was filed, infringe these claims.

In addition to the usual allegations in a bill for infringement, the plaintiff alleged that these same claims had been put in issue in two suits brought by it in the United States District Court for the Eastern District of Michigan, Southern Division, one against Walter Wendt & Co., and the other against Jones & Rosser, in which these parties were charged with infringement by sale of Essex Tite-Edge heels exactly like (except perhaps as to size and color) Exhibit No. 1, Series A; that the Essex Rubber Company assumed the entire charge of such suits, and controlled and maintained the same until entry of final decree, about November 1, 1920; that it participated in the suits and agreed with the defendants to, and did, pay all expenses thereof, including the expenses and fees of defendants' counsel and the costs and judgments; that, after the plaintiff was informed that the Essex Company had assumed entire control of the suits, interlocutory decrees pro confesso were entered, adjudging the patent valid and infringed, and thereafter the matters in each case were referred to a master for accounting; that proceedings were had before the master, at which counsel of the Essex Rubber Company appeared and presented the Essex Rubber Company's interest; that thereafter, the plaintiff's claims for damages and profits having been adjusted between the plaintiff and such counsel for the Essex Rubber Company, final decrees were entered (November 1, 1920) adjudging the patent valid and infringed by the sale of such Essex Tite-Edge heels, title in the plaintiff, and ordering the issuing of permanent injunctions, and that the plaintiff recover, in lieu of profits, the amounts agreed upon. The plaintiff further charged that it was informed and believed in the exclusive control of the suits by the Essex Rubber Company, its participation therein, and its contribution thereto, before the entry of final decrees, as such actions were done openly by the Essex Rubber Company; and, in view of the foregoing allegations, it alleged that the Essex Rubber Company was estopped by the adjudication in the Wendt and Jones & Rosser Cases from contesting each and every issue in the case at bar, and in particular the question of infringement, so far as it related to the sale by the Essex Rubber Company of heels like Exhibit 1, Series A.

The plaintiff also alleged in its bill that these same claims were put in issue in two suits brought by it in the United States District Court for the Northern District of Ohio, Eastern Division, one against H. H. Hackman & Co. and the other against Thomas Urbansky & Sons Company, in which H. H. Hackman & Co. were charged with infringement by sales of Essex Tite-Edge heels exactly like Exhibit No. 1, Series A, and Thomas Urbansky & Sons Company with infringement by sales of Essex Tite-Edge heels exactly like Exhibit No. 1, Series A, and Exhibit No. 2, Series B. It is further alleged that about November 8, 1919, the plaintiff procured a preliminary injunction in the Hackman suit as to heel Exhibit 1, Series A; that about December 23, 1919, an interlocutory pro confesso decree was entered, and about August 7, 1920, a final decree; that the Essex Rubber Company contributed to the expenses of such suit paying all the expenses, and agreeing in advance with H. H. Hackman & Co. to pay all expenses of the suit, and that it paid all the court costs, and that all these acts were done to the knowledge of the plaintiff which was acquired before the entry of final decree.

As to the Urbansky suit, it alleged that the Essex Rubber Company paid all the expenses of the suit; that Urbansky took no steps therein without consulting the Essex Rubber Company, obtaining their direction with regard to said suit, and agreed with Urbansky to pay all expenses of such suit directly after the suit was instituted; that about January 28, 1920, an interlocutory decree pro confesso was entered; that thereafter the matter was referred to a master for accounting; that proceedings were had before the master,

and, the plaintiff's claim for damages and profits having been adjusted, a final decree was entered about August 7, 1920; that the plaintiff was informed of the control by the Essex Rubber Company of the suit and its contribution thereto prior to the entry of said final decree, as such actions were done openly by said Essex Rubber Company.

In view of the foregoing, the plaintiff alleged that the Essex Rubber Company was estopped, by the decree in the Hackman Case, to contest the issue of infringement in this case as to heels like Exhibit No. 1, Series A, and by the decree in the Urbansky Case to contest that issue as to heels like Exhibit 1, Series A, and Exhibit 2, Series B.

[1] In support of its allegations as to the Hackman matter, it appeared that Hackman & Co. were dealers in rubber heels, and had purchased heels from the Essex Rubber Company like those here in question. The plaintiff introduced a certified copy of the record in that suit, which comprised a bill of complaint charging infringement of the plaintiff's patent by the sale of Essex Tite-Edge heels like Exhibit 1, Series A, a motion for a preliminary injunction, a portion of a decree granting a preliminary injunction, a decree styled a final decree, but in fact being only an interlocutory decree pro confesso, as it referred the case to a master to ascertain, state, and report to the court an account of the damages and profits due to infringing the plaintiff's exclusive rights. The record does not show that Hackman & Co. appeared in the case or filed an answer, or that any one else appeared and filed an answer, either in Hackman & Co.'s behalf or in behalf of themselves; and, as the record fails to show that a final decree was entered, it necessarily follows that neither Hackman & Co. nor the defendant here is estopped by the interlocutory decree pro confesso. McGourkey v. Toledo & Ohio Ry., 146 U. S. 536, 545, 13 S. Ct. 170, 36 L. Ed. 1079; Smith v. Vulcan Iron Works, 165 U. S. 518, 524, 17 S. Ct. 407, 41 L. Ed. 810; Humiston v. Stainthorp, 2 Wall. 106, 17 L. Ed. 905; Australian Knitting Co. v. Gormly (C. C.) 138 F. 92, 100, and cases there cited. This renders it unnecessary to consider whether the Essex Rubber Company could, in any view, be regarded as a party to the cause and bound by a decree therein, if a final decree had been entered. But I find that the Essex Rubber Company did not defend or control the suit; that, on being notified by Hackman & Co. of the bringing of the suit, it replied that it would not defend it, but would reimburse them,

in case they concluded not to defend, for damages that might be recovered against them; and that Hackman & Co. replied that they had no intention of defending the suit.

[2] As to the Urbansky matter, it appeared that Thomas Urbansky & Sons Company were also dealers in heels purchased from the Essex Rubber Company, and the plaintiff introduced a certified copy of the record in that case, comprising a bill of complaint charging infringement of plaintiff's patent by the sale of Essex Tite-Edge heels, a motion for preliminary injunction, an interlocutory decree pro confesso directing a reference to a master for an accounting, an order fixing the compensation of the master and stenographer, and directing that the same be taxed as costs, and an order stating that, as a settlement had been made of all claims for profits, the reference to the master was withdrawn, the interlocutory decree made final, and the plaintiff was to pay all costs. There is nothing in the record that shows any one filed an appearance or answer in that case for the defendant, or took any action in its behalf. The inference to be drawn from the record is that, after the case was sent to the master, before whom it was necessary for the complainant (the present plaintiff) to adduce evidence showing what its damages were, the plaintiff procured an agreement with Thomas Urbansky & Sons Company as to the amount due it, obtained satisfaction thereof, and then had an order entered making the interlocutory decree pro confesso final, without having any sum adjudged due it as damages, but ordering that the costs incurred be paid by itself.

The deposition of Thomas J. Urbansky, vice president and secretary of the Urbansky Company, was introduced in evidence. In it he testified that, after the suit was brought against his company, he wrote to the Essex Rubber Company that they had been sued, and that the Essex Company replied, advising the Urbansky Company to let the matter go by default, and it would reimburse them for the expense they were put to; that, if this request had been contrary to their own interests, they would not have acquiesced in it; that neither the Essex Company nor any one representing them took any part in the conduct of the litigation; that all the Essex Company did was to reimburse them for what they paid out; that he personally arranged the settlement with Mr. Fales, attorney for the plaintiff; that Fales undertook to make him account for damages and profits from the sale of other types of heels in addition to the

Tite-Edge; that the Essex Company reimbursed him, but that he did not rely upon its promise to do so, as the expense was small, and it would have been the same anyway, because that company had not undertaken to protect his company against any losses when the goods were purchased. The correspondence between the Urbansky Company and the Essex company shows that the latter advised the former that it would stand behind its jobbers, and pay any judgment which might be obtained against them by reason of any infringement caused by the handling or sale of its goods; that what the I. T. S. Rubber Company was suing its jobbers for was to compel it to submit its case to the courts out in Cleveland, but that it did not propose to do that, as it had its disadvantages.

The deposition of E. D. Fales, a member of the firm of Richey, Slough & Fales, counsel for the plaintiff in this suit, was introduced in evidence and related to the matter now under consideration. Mr. Fales had charge of the Hackman and Urbansky suits as counsel for the plaintiff, and, after taking the depositions of Mr. Urbansky and others in this suit, gave his own deposition. Fales testified that Urbansky told him that the Essex Company had agreed to reimburse his company, and that his company was conducting the case subject to the direction and suggestions of the Essex Company, and was doing nothing otherwise. But the correspondence introduced through these witnesses shows that Urbansky made the settlement with the plaintiff without any direction or suggestion from the Essex Company, and that all the Essex Company did was to reimburse him after it was notified of the settlement.

Taking into consideration all the evidence in the case, I find, as a fact, that the Urbansky Company of its own accord permitted the suit to go by default, and adjusted and settled the matter of accounting after the interlocutory decree pro confesso was entered; that the final judgment made no award of damages, as they had been adjusted and settled by Urbansky out of court; and that the Essex Company did not control the disposition of the case, either openly or otherwise. And I rule that the Essex Company is not estopped by the decree in the Urbansky Case to contest the question whether heels like Exhibit 1, Series A, and Exhibit 2, Series B, infringe the claims here in issue.

In the suit against Wendt & Co., F. O. Richey and E. D. Fales were the counsel, and Campbell, Bulkley & Ledyard were the solicitors for the plaintiff. The record in that case consists of a bill in equity charging the defendant with infringement of the claims here in issue by the sale of Essex Tite-Edge heels like Exhibit 1, Series A; the affidavit of John G. Tufford; the affidavit of Frank M. Slough; an order, entered May 3, 1920, to take the bill pro confesso, no appearance having been entered on the part of the defendant, or answer or other pleading filed, although they should have been on or about the 26th day of April, 1920; a copy of an order filed April 1, 1920, directing Wendt & Co. to appear on the 19th of April, 1920, and show cause why an injunction should not issue as prayed for in the bill; and an interlocutory decree pro confesso entered June 17, 1920, appointing a commissioner to ascertain, take, and state an account, and adjudging that the plaintiff on such accounting should have the right to cause the examination of the defendant, his associates, clerks, servants, workmen, and other employees, and the production of books, vouchers, and documents of such defendant, and that such defendant attend before the master, and awarding a perpetual injunction and costs; a copy of the perpetual injunction filed June 24, 1920; a stipulation, filed November 1, 1920, signed September 13, 1920, by F. O. Richey and E. D. Fales, as counsel for the plaintiff, and Angell & Turner, for the defendant, in which it was stipulated that the defendant would pay at once to the plaintiff $1,000 in cash, that the plaintiff would accept the $1,000 in lieu of profits and damages, and that no appeal should be taken from the final decree of the court in the case; a copy of a final decree entered November 1, 1920, reciting that the defendant, having made settlement of all claims of profits for the sum of $1,000, the reference to the master was withdrawn, that the plaintiff recover of the defendant the sum of $1,000, and the order for an accounting be withdrawn. It further recited the matters set out in the interlocutory decree pro confesso as to validity and infringement.

The record in the Jones & Rosser suit differs in no material respect from the facts shown in the record in the Wendt suit. Both suits were begun at the same time; the patent relied on by the plaintiff in each was the same; the heels charged to be infringements were the same; and the orders taking the bills pro confesso and the interlocutory decrees pro confesso were of the same character, and the respective dates at which they were entered up were the same. As to both matters it appears that Wendt on April 7, 1920,

and Jones & Rosser on April 12, 1920, notified the Essex Rubber Company of the commencement of the suits by the I. T. S. Rubber Company against them, and that the orders to show cause why a temporary injunction should not 'issue were returnable April 19, 1920; that the Essex Company, being unaware of what heels the plaintiff was relying upon in these suits as infringements, arranged, through Angell & Turner, attorneys in Detroit, to procure, if possible, a postponement.of the hearings on temporary injunction, so that it might have an opportunity to examine the exhibits and determine whether it desired to appear and defend; for, if the heels relied upon ,as infringements included the new type of heel which it was manufacturing, it desired to appear and defend, otherwise not; that Angell & Turner conferred with plaintiff's local counsel, who agreed to a postponement, as the plaintiff was desirous of having the Essex Rubber Company appear and defend the suits in that district; that the infringing heels relied upon in the two suits were produced for the examination of New York counsel representing the Essex Company, who, after examining the heels and ascertaining that they did not include the Essex Company's new type of heel, on April 28, 1920, wrote plaintiff's counsel that the Essex Company would not appear, and on April 29, 1920, they wrote Angell & Turner, who also informed plaintiff's counsel, that the Essex Company did not wish to appear; that, no appearances having been entered and no answers filed in either case, orders taking the bill pro confesso were entered May 3, 1920; and that on June 17, 1920, interlocutory decrees pro confesso were entered in both suits; that in July, 1920, the defendants having been ordered to account, and the Essex Company being informed of this, and having previously written Wendt and Jones & Rosser that they would reimburse them for any losses they sustained by reason of the suits, suggested to Wendt and Angell & Turner that they procure an adjustment of the damages and profits in the respective suits; that Wendt and a representative of the firm of Angell & Turner, having ascertained about what the plaintiff would be entitled to recover as damages and profits in the respective suits, proposed a settlement of $1,000 and costs in the Wendt suit and $200 and costs in the Jones & Rosser suit, which were accepted by the plaintiff, and final judgments pro confesso, based upon these agreements, and the interlocutory decrees, were entered; that Wendt paid the judgments in the respective suits and was reimbursed by the Essex Company.

[3] Down to the time of the entry of the interlocutory decrees pro confesso and the issuing of the notices to the respective defendants to appear and account, I find that the Essex Company did not exercise control over the management and conduct of the suits; that the respective defendants allowed them to go by default of their own free will; and that the plaintiff had no reason to understand or believe that it was managing or conducting the cases.

[4] Rule 16 in equity provides:

"It shall be the duty of the defendant, unless the time shall be enlarged, for cause shown, by a judge of the court, to file his answer or other defense to the bill in the clerk's office within the time named in the subpœna as required by rule 12. In default thereof the plaintiff may, at his election, take an order as of course that the bill be taken pro confesso; and thereupon the cause shall be proceeded in ex parte."

When the orders and interlocutory decrees pro confesso were entered, the cases thereupon, as required by the above rule, proceeded ex parte. Thereafter neither Wendt & Co., nor Jones & Rosser, nor any one else, had any right to appear, and never did appear, as a party in defense of either suit. Frow v. De La Vega, 15 Wall. 552, 554, 21 L. Ed. 60; Thomson v. Wooster, 114 U. S. 104, 119, 5 S. Ct. 788, 29 L. Ed. 105. And when Wendt & Co. and Jones & Rosser went before the master in response to his summons to account, they did so as witnesses in the plaintiff's behalf, and in no other way. And the fact that the Essex Company co-operated with Wendt and Jones & Rosser through Angell & Turner to bring about adjustments of the damages and profits, which adjustments were used by the plaintiff, in place of the master's findings, as a basis upon which, in part, at least, to obtain the final decrees, does not seem to me to be such an exercise of control of the cases as would make the Essex Company a party defendant, even though the plaintiff understood that Angell & Turner represented the Essex Company, as well as Wendt and Jones & Rosser, in adjusting the damages and profits.

[5, 6] Before the damages were adjusted, the issue of infringement upon which the plaintiff here relies had been decided by the court and embodied in the pro confesso decrees (Thomson v. Wooster, 114 U. S. 104, 113, 5 S. Ct. 788, 29 L. Ed. 105), and, although these decrees did not become binding as an estoppel until the entry of the final

decrees and the expiration of the term at which they were entered (L. E. Waterman Co. v. Modern Pen Co. [D. C.] 193 F. 242, 243), no one sought or procured leave to appear as a party, or to in any way interrupt the ex parte course which the cases were to take under the rule. After the entry of the pro confesso decrees, and as long as they stood unrevoked, Wendt & Co. and Jones & Rosser were absolutely barred and precluded from alleging anything in opposition to or in derogation of them, and, as the decrees were never revoked, they were bound by them as to the question of infringement from the date of their entry. Thomson v. Wooster, 114 U. S. 104, 114, 5 S. Ct. 788, 29 L. Ed. 105.

Under the circumstances I find that the Essex Company did not control either the Wendt or Jones & Rosser suits, and rule that they are not estopped from contesting the question of infringement raised in this case.

The claims here in issue read as follows:

"5. A heel lift of substantially nonmetallic resilient material, having its body portion of concavo-convex form on every line of cross-section, the concave upper face lying entirely below a plane passing through the rear upper edge and the breast corners of the lift.

"6. A heel lift of substantially resilient material, having its body portion of concavo-convex form on every line of cross-section, the concave upper face lying entirely below a plane passing through the rear upper edge and the breast corners of the lift, said lift being provided with nail-receiving openings located near the center thereof.

"7. A heel lift of substantially resilient material, comprising a body portion, the attaching face of which is concave and the tread face of which is convex on every line of cross-section and normally held in such form by its own inherent resiliency, the concave attaching face lying entirely below a plane passing through the rear upper edge and the breast corners of the lift, whereby to cause the entire margin of said lift to exert a uniform pressure on the heel of a shoe when said lift is positioned on the heel and the convex tread face thereof depressed to flatten said lift.

"8. A heel lift of resilient material, comprising a body portion of uniform thickness throughout its entire area and of concavo-convex form on every line of cross-section, the concave upper face of the lift lying entirely below a plane passing through the upper edge and the breast corners of said lift.

"9. A heel lift of resilient material, comprising a body portion, the attaching face of which is concave and the tread face of which is convex, the concave face of the lift being unbroken and lying entirely below a plane passing through the rear upper edge and the breast corners of the lift, whereby when the convex tread face is depressed to flatten said lift a suction will be created between the lift and the heel to hold the attaching face of the lift throughout its entire extent in contact with the exposed face of the heel."

It will be seen that each of these claims, with the exception of claim 8, contains a clause wherein the concave upper face is described as "lying entirely below a plane passing through the rear upper edge and the breast corners of the lift," and that in claim 8 the language of the claim is the same, with the exception that the word "rear," before "upper edge," is omitted. It appears, however, from an examination of the file wrapper of the reissued patent, that the omission of the word "rear" in the eighth claim was a clerical error, due to oversight; that counsel for the applicant and the Examiner in charge of the application understood that all these claims as drawn, at the time they were allowed, contained the word "rear" preceding the words "upper edge." This appears from what will be found in the file wrapper of the reissued patent, beginning on page 50 and extending to page 56. On page 54 of the file wrapper the Examiner says: "In each of the claims 5, 6, 7, 8, and 9 applicant specifies 'that the concave upper face lies entirely below a plane tangent to the rear upper edge and the breast corners of the lift,'" and it there appears that these claims were rejected, not because of the wording of the claims, but because of one of the drawings (Fig. 2) filed in the case. This drawing (Fig. 2) did not at that time conform to the shape of the plaintiff's heel, and, because of that, the claims were disallowed, as they would not read upon Fig. 2. The only change thereafter made in the claims as they then stood was the insertion of the words "passing through" for "tangent to" in the clause here in question, and to define the meaning of the clause as amended. Figure 2 having been changed to conform to the plaintiff's heel, the following provision was inserted in the specification:

"By references to Figs. 2 and 4 of the drawings, it will be seen that the concave upper face of the lift lies entirely below a plane passing through the rear upper edge and breast corners of the lift whereby to

cause the entire margin of said lift to exert a uniform pressure on the heel of a shoe when the lift is positioned on the heel and the convex face thereof depressed to flatten said lift. In other words, owing to the curvature of the concave attaching face of the lift, *the rear upper edge and breast corners of said concave attaching face are disposed in a plane above the upper side edges and the breast edges of the lift.*

This amendment, in connection with new Figure 2, clearly shows that the plaintiff's heel was to have a rear upper edge and breast corners located "above the upper side edges and the breast edges of the lift," and that the words "passing through" meant a plane passing through the rear upper edge and breast corners, and above the side and breast edges.

The conclusion that the word "rear" was omitted from the clause under consideration in claim 8 through inadvertence, and was a clerical error, is further shown by the language used in the claim itself; for a plane passing through the upper edge, if upper edge meant the entire upper edge, as in defendant's heel, would pass through the breast corners as well, and there would have been no occasion for stating in that clause that it passed through the breast corners. Then, again, down to the time it was pointed out in the decision of the Circuit Court of Appeals of June 7, 1922 (281 F. 5), the plaintiff had always recognized that this clause in claim 8 read the same as it does in the other claims; that was its position before the District Court, before the case was taken to the Circuit Court of Appeals, and has apparently been its position before other courts where these claims have been considered.

The defendant makes and sells two sets of heels, which the plaintiff claims infringe its patent—Exhibit No. 1, Series A, and Exhibit No. 2, Series B. Exhibit No. 1, Series A, is a concavo-convex heel on every line of cross-section, the concave face of which, however, is located below a plane which passes through the entire upper edge of the lift, except the breast edge. The breast edge is raised considerably above the lowest point back of it in its concave face, but not enough to be in the same plane with the side and rear upper edges of the heel. Exhibit No. 2, Series B, differs from Exhibit No. 1, Series A, only in the fact that the breast edge at its lowest point is about one-fiftieth of an inch higher than the lowest point back of it in the concave face of the lift.

In the decision handed down by the Circuit Court of Appeals in this case on June 7, 1922 (281 F. 5), it was held that the heel

described by the language of claims 5, 6, 7, and 9 was "the three-point contact form, having its side and breast edges, as well as its concave attaching face, located below a plane passing through the rear upper edge and breast corners of the concave face," and that this was due to the fact that the claims contained the clause defining the concave upper face as "lying entirely below a plane passing through the rear upper edge and breast corners of the lift." And as I find that claim 8 embodies the same clause, the word "rear" having been omitted through oversight, that claim, as well as claims 5, 6, 7, and 9, describes a heel of "the three-point contact form, having its side and breast edges, as well as its concave attaching face, located below a plane passing through the rear upper edge and breast corners of the concave face." So far as this clause of the claims is concerned, they stand alike upon the question of infringement.

It is the contention of the defendant that these claims are not entitled to a broad construction; that the patentee, by acquiescing in the denial of claims asked for in the Patent Office and by the acceptance of claims embodying the clause, "the concave upper face lying entirely below a plane passing through the rear upper edge and breast corners of the lift," limited himself in such a way that he is not entitled to a broad range of equivalents, and that, when the claims are so limited, the defendant's heels do not infringe.

In the original application, by amendments filed December 15, 1913, and April 21, 1914, the applicant asked for claims reading as follows:

"A cushion heel lift having a concave attaching face and a convex tread face, the edges of the attaching face all occupying the same plane.

"A cushion heel lift having a concave attaching face and a convex tread face and having its edges radial to the curvature of said faces, the edges of the attaching face all occupying the same plane."

These claims, July 7, 1914, were rejected by the Examiner, the rejection was acquiesced in by the applicant, and the original patent was issued with claims 1, 2, 3, and 4 only. The claims here in controversy were granted on the application of June 22, 1915, of the reissued patent. In that application six new claims were asked for, all of which, on July 8, 1915, were rejected. These claims read as follows:

"5. A cushion heel lift having a concave-convex form on every line of cross-section.

"6. A cushion heel lift, the attaching face

of which is concave, and the tread face of which is convex on every line of cross-section.

"7. A cushion heel lift, the attaching face of which is concave and the tread face of which is convex on every line of cross-section, there being nail-receiving openings penetrating the lift near the center thereof.

"8. A cushion heel lift, the attaching face of which is normally concave, and the tread face of which is normally convex on every line of cross-section, thereby to cause the entire margin of the lift to snugly engage the heel of a shoe when said lift is positioned on the heel and pressure applied to the convex face thereof to flatten said lift.

"9. A cushion heel lift having a concavo-convex form on every line of cross-section, and provided with openings piercing the lift near the crest of the convex face thereof.

"10. A heel lift, formed of yieldable material and provided with a normally convex tread face and a normally concave attaching face defining a suction area whereby, when the lift is positioned on the flat surface of a heel and pressure is applied to the convex face of the lift, the margin of said lift will be retained in engagement with the margin of the heel by the action of the suction area."

These claims having been rejected by the Examiner, the applicant, on August 20, 1915, asked that they be reconsidered and filed an additional claim No. 11. August 30, 1915, the applicant acquiesced in the rejection of claims 5 and 6, suggested slight amendments to the others, and added two claims, requesting that claim 7 be numbered 5, and so on, down to 11. October 2, 1915, the Examiner rejected these claims, and on October 13, 1915, the applicant acquiesced in the rejection, and requested the substitution of four new claims, 5, 6, 7, and 8. These last claims read as follows:

"5. A heel lift of resilient material, comprising a body portion of concavo-convex form on every line of cross-section, and normally held in such form by its own inherent resiliency.

"6. A heel lift of resilient material, comprising a body portion, the attaching face of which is concave and the tread face of which is convex on every line of cross-section, and normally held in such form by its inherent resiliency only, said lift being provided with nail-receiving openings located near the center thereof.

"7. A heel lift of resilient material, comprising a body portion, the attaching face of which is concave and the tread face of which is convex on every line of cross-section, and normally held in such form by its in-

herent resiliency only, whereby to cause the entire margin of the lift to exert a uniform pressure on the heel of a shoe when said lift is positioned on the heel and the convex tread face thereof depressed to flatten said lift.

"8. A heel lift of resilient material, comprising a body portion, the attaching face of which is concave and the tread face of which is convex, and normally held in such form by its inherent resiliency only, the concave face of the lift being free from projections, whereby, when the convex tread face is depressed to flatten said lift, a suction will be created between the lift and the heel to hold the attaching face of the lift through its entire extent in contact with the exposed face of the heel."

In the remarks of applicant's counsel in presenting these new claims it was stated "the foregoing amendment has been made after a *personal* interview with the Principal Examiner, during which a specimen heel lift, constructed in accordance with applicant's invention and also exhibit rubber heels now on the market, were presented for inspection."

October 22, 1915, the Examiner, replying to the amendment filed October 13, 1915, rejected the claims and stated, "Applicant may regard this rejection as final, if he so desires," which meant that he might take an appeal, if he wished.

October 27, 1915, the applicant acquiesced in the rejection of these four claims, and offered an amendment to his specification reading as follows:

"By reference to Figs. 2 and 4 of the drawings, it will be seen that the concave upper face of the lift lies entirely below a plane tangent to the rear upper edge and the breast corners of the lift, whereby to cause the entire margin of said lift to exert a uniform pressure on the heel of a shoe when the lift is positioned on the heel and the convex face thereof depressed to flatten said lift."

He also offered five new claims—containing the clause "the concave face lying entirely below a plane," etc.—which read the same as claims 5, 6, 7, 8, and 9 of the reissued patent, except that, where the words "passing through" are used in the claims in suit, the words "tangent to" appeared. From the remarks of counsel in presenting these amendments it appears that he relied largely, to differentiate these claims from the prior art, on the fact that the concave upper face of the lift lay entirely below a plane tangent to the rear upper edge and breast corners of the lift.

On November 16, 1915, the Examiner, in

his reply to the amendments of October 27, 1915, adverted to the applicant's amendment of claims 4 and 5 of the original application, by adding thereto the phrase, "the edges of the attaching face all occupying the same plane," and the remarks of the applicant of October 13, 1915, in the present application, where he said, "Even were the *breast* of the heel *closed*, as in applicant's *devise*," etc., and that he would judge that "applicant's heel lift was *meant* to be so constructed as to have all of its upper edges occupy the same plane," etc. Then he calls attention to applicant's amendment to his specification of October 27, 1915, where it says, "By re-reference to Figs. 2 and 4 of the drawings, it will be seen that the concave upper face of the lift lies entirely below a plane tangent to the rear upper edge and the breast corners of the lift," and concludes that "Fig. 2 does not show such construction, since a point midway between the breast corners of the lift is shown to be in contact with the upper heel portion"; that, according to this figure, a plane tangent to the rear edge and the breast corners would *also pass through* the entire front edge of the lift. The Examiner also stated that Fig. 2 does not correspond to the sample lift shown him, "since all the points of its breast, except the two corner points, lie below a straight line *passing through* these points," and he rejected claims 5 to 9, inclusive, because they did not read on the drawing. This also shows that the Examiner regarded the words "tangent to" and "passing through" as meaning the same thing.

On November 24, 1915, the applicant presented a new sketch of Figure 2, showing the breast and side edges of the heel slightly curved, so that it presented a correct sectional view of Fig. 4, and asked to amend the clause added to the specification by the amendment of October 27, 1915, so that it should read as follows:

"By references to Figures 2 and 4 of the drawings, it will be seen that the concave upper face of the lift lies entirely below a plane passing through the rear upper edge and breast corners of the lift, whereby to cause the entire margin of said lift to exert a uniform pressure on the heel of a shoe when the lift is positioned on the heel and the convex face thereof depressed to flatten said lift. In other words, owing to the curvature of the concave attaching face of the lift, the rear upper edge and breast corners of said concave attaching face are disposed in a plane above the upper side edges and the breast edges of the lift."

And to meet the change in the specification from "tangent to" to "passing through," he requested that the words "tangent to" in his five new claims of October 27, 1915, be changed to "passing through," and asked that an additional claim, which is claim 10 of the patent, be allowed.

It is apparent, from the matters referred to as having taken place during the course of proceedings in the Patent Office, that the patentee sought broad claims, but was denied them, and acquiesced in the denial.

In the original patent he sought claims for a concavo-convex heel, having a straight upper edge, but was denied them.

In the reissued patent he first sought claims for "a heel lift having a concavo-convex form on every line of cross-section" —very broad claims, and in no wise limited as to character or location of the edges of the attaching face of the heel. He was denied these. He then asked for claims somewhat more limited, calling for "a lift of resilient material, comprising a body portion of concavo-convex form on every line of cross-section and normally held in such form by its own inherent resiliency," but so far as the character and location of the edges of the attaching face were concerned equally as broad as the first asked for. These claims were denied, and he acquiesced. Finally, on October 13, 1915, he submitted five claims, substantially like those previously submitted, but all containing the clause "the concave upper face lying entirely below a plane passing through the rear upper edge and the breast corners of the lift," or its equivalent, which defined the character and location of the edges of the attaching face.

[7, 8] Such being the case, it necessarily follows that claims which were allowed with the qualifying clause cannot be construed broadly, and to cover what would be embraced within the claims as they stood June 22, 1915, or October 13, 1915; for to do so would render the qualifying clause meaningless and give to the present claims an interpretation such as the plaintiff would only have been entitled to, had the earlier claims of June 22 and October 13, 1915, not been rejected. The patentee, having narrowed his claims by the insertion of the restricting clause, in order to obtain any claims under the reissued patent, cannot, by construction or by resorting to the doctrine of equivalents, give the claims the larger scope which they might have had without the restricting clause. Webber Electric Co. v. Freeman Electric Co., 256 U. S. 668, 677, 41 S. Ct. 600, 65 L. Ed. 1162. Having acquiesced in the rejection of

the claims as offered on June 22 and October 13, 1915, he is now estopped from claiming the benefit of those claims, or such a construction of his present claims as would be equivalent thereto. Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425, 428, 429, 14 S. Ct. 627, 38 L. Ed. 500; Thomas v. Rocker Spring Co. (C. C. A.) 77 F. 420.

It has been argued before me that claims 5, 6, 7, 8, and 9 of the patent cannot be differentiated from claim 10, if the restricting clause of these claims is given the same meaning as the restricting clause in claim 10, and which the specification says means the same. I do not think this is so. Claim 5 is differentiated from all the other claims, in that it requires the heel lift to be of "substantially nonmetallic resilient material." Claim 6 is differentiated by the heel being provided with "nail-receiving openings located near the center thereof."; claim 7, by the fact that the heel is "normally held in such form by its own inherent resiliency"; claim 8, by the body portion of the heel being of "uniform thickness throughout its entire area"; claim 9, by "the concave face of the lift being unbroken." Claim 10 is differentiated from claim 5 by the clause "substantially resilient material" which is not necessarily nonmetallic as in claim 5; from claim 6 by not having nail-receiving openings; from claim 7 by not being held in shape by its own inherent resiliency; from claim 8 by not being of uniform thickness throughout its entire area; and from claim 9 by not having its face limited to an unbroken concave face. Claims 5, 6, and 8 in express terms provide that the body portion of the heel shall be "of concavo-convex form on every line of cross-section"; claims 7 and 10, that the attaching face of the heel shall be "concave and the tread face convex on every line of cross-section." Claim 7 also contains a whereby clause, which states in substance that the elements of the claim are such as to cause the entire margin of the lift to exert a uniform pressure on the shoe heel when said lift is positioned on the heel, and the evidence shows that this uniform pressure can be obtained only in case the breast edge is raised, as well as the side and rear edges. This being so, it follows that the elements described in claim 7 call for a heel the concave face of which is concave on every line of cross-section. And what is true

of claim 7 is true of claim 10. Claim 9 does not use the term "on every line of cross-section," either as to the concave face or the convex tread, but contains a whereby clause, in which it states that, "when the convex tread face is depressed to flatten said lift, a suction will be created between the lift and the heel to hold the attaching face of the lift throughout its entire extent in contact with the exposed face of the heel." While the language of this whereby clause is not the same as the whereby clause in claim 7, it means the same, and the evidence shows that the result here claimed can be produced only in case the breast is raised as well as the side and rear edges of the heel. Furthermore, if claims 7, 9, and 10 are not capable of this construction, they would seem to be invalid, as calling for a heel not disclosed in the specification.

As said by the Circuit Court of Appeals in this case, "the fundamental conception of plaintiff's patent as to form is one 'molded or cut so as to be of a concavo-convex form on any line of cross-section,' and its principal object or function when so formed is (according to the language of the specification) 'that, when the lift is subjected to pressure, any tendency for the edge portions of the lift to crowd beyond the sides of the shoe heel will be counteracted, and there will be equally as great a tendency for the material of the lift to crowd or compress toward the center thereof.' This means that the retroactive force inherent in the rubber will counteract any tendency of the edge portions of the lift to crowd beyond the sides of the shoe heel when the lift of the patent is subjected to pressure, and thus keep the side and breast edges of the lift in alignment with the side and breast edges of the shoe heel and in close contact therewith."

[9] It is conceded by the defendant that, if the plaintiff's claims are not restricted by the clause here under consideration, and are entitled to a construction warranting a wide range of equivalents, it infringes; but I rule that the claims are restricted by the provision which they all contain, that plaintiff is not entitled to a broad construction of its claims, and find that heels like Exhibit 1, Series A, and Exhibit 2, Series B, do not infringe the plaintiff's claims.

A decree will be prepared, dismissing the plaintiff's bill.